NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
VICTOR A. RODGERS
California Bar No. 101281
Assistant United States Attorney
Asset Forfeiture Section
     Federal Courthouse, 14th Floor
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2569
     Facsimile: (213) 894-0142
     E-mail: Victor.Rodgers@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | ) | Case No. CV 21-00132 |
|---|---|---|
| Plaintiff, | ) | COMPLAINT FOR FORFEITURE |
| v. | ) | 18 U.S.C. § 981(a)(1)(A) and (C) and |
| | ) | 21 U.S.C. § 881(a)(6) |
| $53,800.00 IN U.S. CURRENCY, | ) | |
| | ) | [DEA] |
| Defendant. | ) | |

Plaintiff United States of America brings this claim against defendant $53,800.00 In U.S. Currency, and alleges as follows:

JURISDICTION AND VENUE

1.   Plaintiff United States of America brings this in rem forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A) and (C) and 21 U.S.C. § 881(a)(6).

2.   This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3.   Venue lies in this district pursuant to 28 U.S.C. § 1395.

<u>PERSONS AND ENTITIES</u>

4.   The plaintiff in this action is the United States of America.

5.   The defendant in this action is $53,800.00 In U.S. Currency (the "defendant currency") seized by law enforcement officers from the purse of Jingya Wang while situated in a Honda parked in the Hoa Binh Rosemead supermarket parking lot located at 8235 Garvey Avenue in Rosemead, California.

6.   The defendant currency is currently in the custody of the United States Marshals Service in this District, where it will remain subject to this Court's jurisdiction during the pendency of this action.

7.   The interests of Tao Zhu, Jingya Wang and Jie Chen may be adversely affected by these proceedings.

<u>BASIS FOR FORFEITURE</u>

<u>Background Regarding The Illegality Of Engaging In Money Transmitting Without A License</u>

8.   18 U.S.C. § 1960 makes it a crime to knowingly conduct, control, manage, supervise, direct or own all or part of an unlicensed money transmitting business.  In addition, 18 U.S.C. § 981(a)(1)(A) renders subject to forfeiture any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960, or any property traceable to such property.

2

9.     An unlicensed money transmitting business is defined as one which affects interstate or foreign commerce in any manner or degree and (a) is operated without an appropriate license in a state, such as California, where such operation is punishable under state law, whether or not the transmitter knew that the operation was required to be licensed; (b) is not in compliance with the money transmitting business registration requirements under 31 U.S.C. § 5330 (which requires that money transmitting businesses be registered with the Secretary of the Treasury), or the regulations promulgated thereunder; or (c) otherwise involves the transportation or transmission of funds that are known by the transmitter to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.  Money transmitting is defined as transferring funds on behalf of the public by any and all means including, but not limited to transfers within the United States or to locations abroad by wire, check, draft, facsimile or courier.

10.    As set forth below, the defendant currency was transmitted or attempted to be transmitted on behalf of a third party by Zhu and Wang.  However, neither Zhu nor Wang during the time of the operative events set forth below were licensed by the State of California as an authorized money transmitting business or registered, nor were either of them authorized to function as a money transmitting business under federal law by the Secretary of the Treasury.

11.    Nevertheless, Zhu and Wang knowingly conducted, controlled, managed, supervised, directed and owned an

1  unlicensed money transmitting business affecting interstate and
2  foreign commerce: (a) having failed to obtain an appropriate
3  money transmitting license under California Finance Code § 2030;
4  (b) having failed to comply with the money transmitting business
5  registration requirements under 31 U.S.C. § 5330, and the
6  regulations prescribed thereunder; and (c) having knowingly
7  transported or transmitted funds derived from a criminal offense
8  or which were intended to be used to promote or support unlawful
9  activity.

10  Background Of The Money Laundering Scheme

11      12.  Beginning in approximately February 2019, law
12  enforcement officers have investigated a Chinese money
13  laundering scheme, which involves the transmission of U.S.
14  currency derived from drug sales in the United States to bank
15  accounts in China controlled by Mexico or China based drug
16  trafficking/money laundering organizations.  After the transfer
17  to China bank accounts, the drug trafficking/money laundering
18  organizations often transfer the funds to Mexico in multiple
19  ways, including paying Chinese export manufacturers from the
20  China bank accounts for durable goods that are shipped to Mexico
21  to the drug trafficking organizations' clients.  By avoiding
22  traditional banking channels for the transfer or physically
23  transporting large sums of currency from one country to another,
24  the drug trafficking/money laundering organization seek to avoid
25  the financial institution and law enforcement scrutiny that
26  would otherwise result from their activity and potentially
27  result in the seizure of their ill-gotten gains.

28

13.   One method of transporting drug proceeds from the United States to China consisted of the following.  Persons living in China (i.e., Chinese nationals) will purchase U.S. Currency, which funds are narcotic proceeds that are collected from drug purchasers and delivered in the United States to the China-based purchaser.  Once the U.S. Currency is physically delivered, the China-based U.S. Currency purchaser transfers an approximately equivalent amount in Renminbi, which is also known as "RMB" and is the official currency of the People's Republic of China, from the China-based purchaser's bank account in China to an account in China designated by the drug trafficking/money laundering organization.  As a result, U.S. Currency is converted to Chinese currency on deposit in bank accounts in China, and the only bank transaction involves a transfer between accounts in China, which would normally avoid scrutiny by the Chinese government regarding the currency's provenance.  The scheme often involves drug trafficking/money laundering organizations locating China-based persons to purchase U.S. Currency (which is in actuality drug proceeds) by posting advertisements in Chinese language internet bulletin boards and WeChat forums.

Zhu and Wang's Communications With Undercover Police Officer

14.   On August 11, 2020, a law enforcement officer acting in an undercover capacity and fluent in Mandarin Chinese (the "UC") began communicating in Chinese with another person via text messages sent to a cellular telephone and messaging sent using the WeChat app.  The individual with whom the UC was communicating used cellular telephone number (909) 345-4782 and

the WeChat handle "Eclatdame 12160329."  As a result of database checks, law enforcement officers connected the above-referenced information to an individual (i.e., Zhu) who resided in Rosemead, California.  Later, and as described in further detail below, officers learned during post-arrest interviews of Zhu and Zhu's wife Wang that both Zhu and Wang communicated with the UC using the cellular telephone and Eclatdame 12160329 handle.

15.   During the communications with the UC, the user of the cellular telephone and Eclatdame handle agreed to sell the UC approximately $60,000 in U.S. Currency, in exchange for the UC transferring RMB (i.e., the official currency of the People's Republic of China) from the UC's bank account in China to a bank account in China designated by Zhu and Wang.  The parties agreed during the communications that the UC and the person with whom the UC was communicating (i.e., Zhu and/or Wang) would meet at 4:00 p.m. on August 13, 2020 at the Hoa Binh Supermarket parking lot located at 8235 Garvey Avenue in Rosemead, California at which time Zhu and/or Wang would provide the U.S. Currency.

16.   Officers conducted surveillance on August 13, 2020 of Zhu and Wang's activities.  At approximately 3:00 p.m. on August 13, 2020, the UC sent a text to Zhu and/or Wang (as the user of the cellular telephone) that provided that the UC was at the supermarket parking lot in a grey Caravan and requested that the parties meet at that location at 3:30 p.m.  Zhu and/or Wang responded via a text that they would arrive at that location shortly in a white vehicle.

17.   A few minutes later, officers saw a white Honda depart from the Rosemead, California residence, which officers had

connected to Zhu via database checks as mentioned above and was Zhu and Wang's residence, with Zhu driving and Wang traveling as a passenger.  Officers then saw Zhu and Wang drive into the supermarket parking lot at approximately 3:15 p.m. and park next to the grey Caravan where the UC was waiting.  Zhu then exited the white Honda and walked to the front of the Caravan's passenger window, but then turned around and started walking back to the Honda when Zhu saw that the UC did not appear to be Chinese.

18.  Officers then approached and told Zhu and Wang that officers were conducting an investigation.  Wang told officers that her identification was inside her purse, and officers found $53,800.00 (i.e., the defendant currency) in Wang's purse. Officers travelled with Zhu and Wang back to their Rosemead, California residence.

19.  On the floor in Zhu and Wang's bedroom at their residence officers saw a money counter.  While at the residence, officers spoke with Zhu and Wang, neither of whom knew during the discussion until officers disclosed this information, that a law enforcement officer (i.e., the UC) was the person with whom Zhu and Wang had been communicating over the cellular telephone and WeChat regarding the fact that the defendant currency was part of the money transfer.  Unaware that they had been speaking with law enforcement concerning the money transfer agreement, Zhu and Wang, as set forth below, made multiple false statements to officers regarding the reasons they were carrying over $53,000.00 in currency in the parking lot of supermarket on August 13, 2020.

Officers' Separate Discussions With Zhu

20.  Officers spoke with Zhu and Wang separately, and told Zhu that officers wanted to ask Zhu questions about the $53,800.00.  When officers asked what Zhu planned to do with the funds officers had recovered from Zhu and Wang's vehicle, Zhu stated that a Chinese guy had contacted him (Zhu), and that officers would have to ask Zhu's wife for more details.

21.  In addition, Zhu stated that the $53,800.00 was his money, that he kept $10,000.00 to $20,000.00 in his house for emergencies, and that he and Wang often traveled to Las Vegas to gamble and had made four to seven trips to Las Vegas over the preceding month.  Zhu stated that he was at the Wynn casino in Las Vegas the preceding day, had taken $30,000.00 to Vegas and had made $4,000.00 in profit, thus accounting for $34,000.00 of the funds.  In addition, Zhu stated that his mother-in-law Jie Chen had given him $10,000.00 about a week earlier.  (However, Chen did not answer the telephone when officers called Chen to verify Zhu's story).  When officers asked about the source of the remaining $20,000.00, Zhu stated that it was hard to say and it was probably from work.

22.  Zhu also stated that neither he nor Wang had a license from the U.S. Department of Treasury or the State of California to operate as a money service (i.e., transmission) business. When officers asked why Zhu would provide $53,800.00 to a stranger in a public parking lot, Zhu stated that he had no idea why he would do so.

23.  Officers then told Zhu that the Chinese guy with whom Zhu and Wang had communicated on WeChat was actually the police.

8

At that point, Zhu changed his story regarding his knowledge of the purpose of the supermarket parking lot meeting.  Now, when officers asked why Zhu and his wife came to the parking lot, Zhu did more than (as he had earlier) tell officers that they needed to ask Zhu's wife for details.  Instead, Zhu now stated that he did so because he needed Chinese money (i.e., RMB).  Officers asked why Zhu needed Chinese money, and Zhu stated that he wanted to send money to his family in China.  When officers questioned Zhu about making a 4% profit on the money transfer, Zhu claimed he was going to lose money on the transaction.

24.  Zhu also stated that this was the first time he had ever tried to send money to China in this manner.  In addition, Zhu stated that a bank asked too many questions about the money and where it came from, in order for Zhu to conduct the transfer in a legal way.  Zhu stated that he knew that trying to do the money transfer was illegal, and further stated that he was conducting the transfer illegally because it was the fastest way to do the transfer.

25.  In addition, Zhu told officers that his wife was the one talking with the police on WeChat.  Zhu also confirmed his cellular telephone number was listed on the Chinese on-line advertisement for the money transfer.  In addition, Zhu claimed that he did not know what account in China the money was going to be transferred and told officers to ask his wife about the matter.  Officers looked at information in Zhu's cellular telephone, in order to confirm Zhu's statements, and found the information set forth in paragraph 29 below.

26.  Zhu claimed that he and Wang had about $90,000.00 in the stock market, but (notwithstanding these significant stock holdings) Zhu told officers that he had been collecting unemployment since March 15, 2020 and had only about $20,000.00 in his bank account.  In addition, officers' review of Zhu's 2019 tax paperwork reflected that Zhu had made only $125,000 before taxes (i.e., Zhu's gross income) in 2019.

Officers' Separate Discussions With Wang

27.  Officers also spoke with Wang separately, and told Wang that they wanted to ask her questions about the money. Wang stated that she did not count the funds, did not know how much money was inside her purse (where officers had found the defendant $53,800.00 in U.S. Currency), and that all she knew was that Zhu and Wang had borrowed $10,000.00 from Wang's mother.  When officers asked Wang why Zhu and Wang needed to borrow money when Zhu claimed they were financially well off, Wang could not provide an explanation.  In addition, Wang stated that she did not know the source of any other portion of the funds and that she normally did not see large sums of funds, like $53,800.00, lying around Zhu and Wang's house.

28.  Wang confirmed that she had posted an on-line advertisement to exchange U.S. currency for RMB, but Wang stated that Zhu had told her what information to place in the advertisement.  In addition, Wang stated that while she had typed the conversation on WeChat (with the UC), Zhu had told her what to say.

29.  Officers then told Wang that officers had looked at Zhu's cellular telephone and discovered that Zhu and Wang had

10

conducted several money transfer exchanges.  (Officers saw in Zhu's cellular telephone conversations reflecting that Zhu had sold the equivalent of approximately $89,000.00 on August 11 and 12, 2020 in three separate transactions to an individual using the WeChat handle "Sherman Liang."  Accordingly, over the three days between August 11 and 13, 2020, Zhu had arranged to transfer over $140,000.00, when the defendant $53,800.00 in U.S. Currency transaction is included.  Also, officers found in Zhu's cellular telephone a picture of a large amount of U.S. Currency inside Zhu and Wang's hotel room in Las Vegas, and in the immediately next picture on the camera roll in the telephone a snapshot of the exchange rate between the U.S. dollar and Chinese RMB.  Illegal money sellers often exchange screenshots of the official exchange rate between the U.S. dollar and Chinese RMB during negotiations to sell U.S. dollars in a money transfer transaction.  In addition, and as mentioned above, a money counter was found at Zu and Wang's residence, and the presence of a money counter is indicative of persons engaging in illegal money transfers).

30.  When officers told Wang what officers had found in Zhu's cellular telephone, Wang stated that this was the first time she had been this involved in a money transfer.  In addition, Wang stated that she believed that Zhu had done money transfers about four to five times in the preceding two or three months.  Wang stated that she had been on unemployment since March 2020.

31.  In addition, Wang stated that neither she nor Zhu had a license from the U.S. Department of Treasury or the State of

California to operate as a money service (i.e., transmission) business, and also stated that taxes were the reason that operating without a money service business license was illegal (i.e., persons engaged in an unlicensed money service/transmission business fail to pay income taxes on the income they receive from money transfers).  Wang also stated that Zhu was in charge of determining the rates and percentages for the money transfer (with the UC), and that she only helped a little with Zhu's prior money transfers.  In addition, Wang stated that Zhu and Wang had purchased the money counter about three or four months earlier and had started doing the money transfers after they had lost their jobs.

Officers' Discussions With Zhu And Wang Together

32.  Officers then spoke with Zhu and Wang together.  Zhu stated that he intended to transfer the funds officers had recovered (i.e., the defendant currency) into a Chinese account belonging to Zhu's parents, and had told Wang to place the online advertisement for money transfers.  When officers told Zhu he had lied about having done a money transfer only one time, Zhu still denied having engaged in that type of transaction more than once.

33.  Officers then spoke with Zhu about the information on Zhu's cellular telephone reflecting that Zhu had done multiple money transfers over a matter of a few days, and Zhu in response claimed that he had only done transfers with his friend.  However, when officers stated that the UC with whom Zhu had attempted that day to conduct the $53,800.00 money transfer was not Zhu's friend, Zhu had no answer.  Instead, Zhu changed the

subject, and claimed that he was losing money in light of the transfer rate.  However, when officers stated that the law requiring a license did not require that Zhu make a profit based on the transfer rate, Zhu replied "That's true."

34.   When officers asked Zhu where all the $53,800.00 had come from, Zhu acted as if he did not understand the question. However, Zhu suddenly changed his demeanor when officers began to arrest him.  Zhu then stated that he would be honest, and then admitted that he had done illegal money transfers three different times.  In addition, Zhu stated that he had made $2,700.00 for doing $90,000.00 in illegal money transfers.

Other Illegal Activity

35.   Not surprisingly, when officers found information in Zhu's cellular telephone reflecting that Zhu had conducted illegal money transfers totaling $89,000.00 on August 11 and 12, 2020, Zhu admitted only to have engaged in illegal money transfers up to $90,000.00 based on the clear evidence. However, additional information showed Zhu had engaged in other illegal activities involving money transfers three months earlier.

36.   Officers reviewed a bank statement for Zhu's Citibank account with the last four digits ending in 9105 and saw three international wires totaling $149,945 into the account on May 6, 2020 for $49,985, $49,980 and $49,980, respectively, which are sums slightly below the $50,000.00 limit that Chinese citizens are allowed to remove from China each year.  The fact that the wire amounts were slightly below the $50,000.00 limit evidences that the wire amounts were structured to avoid the limit.

37.   In addition, the bank statement reflects that immediately following the wires into Zhu's account, $150,000.00 was transferred from Zhu's account to a bank account in the United States.   Zhu admitted to officers that the wires came from China and claimed the $150,000.00 transfer out of his account went to a professional investor.   Accordingly, Zhu assisted in the structuring, and transferred the funds without a money service/transmission business license.

Narcotic Detection Canine Alert

38.   On August 13, 2020, officers had a trained, state-certified narcotic detection canine sniff the defendant currency, and the canine alerted, which signifies that the funds had recently been in close proximity with narcotics.   As of the time of the alert, the canine had received over 400 hours of training during which time the canine successfully found training aids that contained actual narcotics.   The canine used to sniff the defendant currency alerts to the scent of narcotics for which the canine is trained.   In addition, the canine has also been trained with general currency in circulation, in order to make sure that the canine does not alert to the odor of currency but instead to the presence of narcotics on currency. On or about June 21, 2017, the canine and canine handler were certified for use as a team, and the canine has successfully passed the tests for the canine's recertification.   As of the August 13, 2020 alert, the canine had been successfully used in multiple cases in which narcotics had been found, and was responsible in assisting in the seizure of over 800 pounds of narcotics and over $4.5 million in narcotic proceeds.

1

<u>FIRST CLAIM FOR RELIEF</u>

2     39.   Plaintiff incorporates the allegations of paragraphs

3 1-38 above as though fully set forth herein.

4     40.   Based on the above, plaintiff alleges that the

5 defendant currency represents or is traceable to proceeds of

6 illegal narcotic trafficking, was intended to be used in one or

7 more exchanges for a controlled substance or listed chemical, or

8 was used or intended to be used to facilitate a controlled

9 substance or listed chemical violation, in violation of 21

10 U.S.C. § 841 <u>et</u> <u>seq.</u>   The defendant currency is therefore

11 subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

12

<u>SECOND CLAIM FOR RELIEF</u>

13     41.   Plaintiff incorporates the allegations of paragraphs

14 1-38 above as though fully set forth herein.

15     42.   Based on the above, plaintiff alleges that the

16 defendant currency constitutes or is derived from proceeds

17 traceable to a controlled substance or listed chemical

18 violation, a specified unlawful activity as defined in 18 U.S.C.

19 §§ 1956(c)(7)(A) and 1961(1)(D).   The defendant currency is

20 therefore subject to forfeiture pursuant to 18 U.S.C.

21 § 981(a)(1)(C).

22

<u>THIRD CLAIM FOR RELIEF</u>

23     43.   Plaintiff incorporates the allegations of paragraphs

24 1-38 above as though fully set forth herein.

25     44.   Based on the above, plaintiff alleges that the

26 defendant currency constitutes property involved in multiple

27 transactions or attempted transactions in violation of 18 U.S.C.

28 § 1956(a)(1)(B)(i), or property traceable to such property, with

the specified unlawful activity being a controlled substance or listed chemical violation.  The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

FOURTH CLAIM FOR RELIEF

45.  Plaintiff incorporates the allegations of paragraphs 1-38 above as though fully set forth herein.

46.  Based on the above, plaintiff alleges that the defendant currency constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1957(a), or property traceable to such property, with the specified unlawful activity being a controlled substance or listed chemical violation.  The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

FIFTH CLAIM FOR RELIEF

47.  Plaintiff incorporates the allegations of paragraphs 1-38 above as though fully set forth herein.

48.  Based on the above, plaintiff alleges that the defendant currency constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1960 (illegal money transmitting business), which is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).  The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

SIXTH CLAIM FOR RELIEF

49.  Plaintiff incorporates the allegations of paragraphs 1-38 above as though fully set forth herein.

50.  Based on the above, plaintiff alleges that the defendant currency constitutes property involved in multiple

16

transactions or attempted transactions in violation of 18 U.S.C.
§ 1956(a)(1)(B)(i), or property traceable to such property, with
the specified unlawful activity being violations of 18 U.S.C.
§ 1960 (illegal money transmitting business).  The defendant
currency is therefore subject to forfeiture pursuant to 18
U.S.C. § 981(a)(1)(A).

SEVENTH CLAIM FOR RELIEF

51.  Plaintiff incorporates the allegations of paragraphs
1-38 above as though fully set forth herein.

52.  Based on the above, plaintiff alleges that the
defendant currency constitutes property involved in multiple
transactions or attempted transactions in violation of 18 U.S.C.
§ 1957(a), or property traceable to such property, with the
specified unlawful activity being violations of 18 U.S.C. § 1960
(illegal money transmitting business).  The defendant currency
is therefore subject to forfeiture pursuant to 18 U.S.C.
§ 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays:

(a)  that due process issue to enforce the forfeiture of
the defendant currency;

(b)  that due notice be given to all interested parties to
appear and show cause why forfeiture should not be decreed;

(c)  that this Court decree forfeiture of the defendant
currency to the United States of America for disposition
according to law; and

/ / /

/ / /

/ / /

17

1     (d)  for such other and further relief as this Court may

2   deem just and proper, together with the costs and disbursements

3   of this action.

4   Dated: January 6, 2021          NICOLA T. HANNA
                                     United States Attorney
5                                    BRANDON D. FOX
                                     Assistant United states Attorney
6                                    Chief, Criminal Division
                                     STEVEN R. WELK
7                                    Assistant United States Attorney
                                     Chief, Asset Forfeiture Section
8

9                                    /s/ Victor A. Rodgers
                                     VICTOR A. RODGERS
10                                   Assistant United States Attorney
                                     Asset Forfeiture Section
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                     18

VERIFICATION

I, Darron Lee, hereby declare that:

1.   I am a Special Agent with the Drug Enforcement Administration.

2.   I have read the above Complaint for Forfeiture and know the contents thereof.

3.   The information contained in the Complaint is either known to me personally, was furnished to me by official government sources, or was obtained pursuant to subpoena.   I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on *December 18*, 2020 at *San Diego*, California.

_____
Darron Lee